# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 3, 2009

Charles R. Fulbruge III
Clerk

No. 06-20443

SCOTT A SAMFORD, JR

Plaintiff - Appellant

v.

DOUG DRETKE; WARDEN STAPLES; DOCTOR SCARMADO; LISA
VATANI, Health Provider; MINNIE CROUCH; UNIT WARDEN OF LAW
LIBRARIAN

Defendants - Appellees

---

SCOTT A SAMFORD, JR

Plaintiff - Appellant

v.

DOUGLAS DRETKE

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas, Houston
No. 4:06-CV-497

Before KING, STEWART, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Scott Samford, Texas prisoner # 835644, appeals the dismissal of his § 1983 suit in which he alleged that defendants improperly prevented him from communicating with his two sons. Samford was convicted of aggravated assault after he brought a handgun to his ex-wife's house when his sons were present and, after threatening to shoot his ex-wife and any police officers that might arrive, shot himself just outside the front door. He survived and pleaded *nolo contendere* to aggravated assault. The sentencing court initially placed Samford on probation with the condition that he have no contact with his ex-wife and sons, but he violated that condition and was sentenced to 20 years' incarceration. While in prison, Samford's sons were placed on his negative mail list and were removed from his approved visitors list. Proceeding *pro se* and *in forma pauperis* in the district court, Samford argued that restricting his communication with his sons in these ways violates his First Amendment rights to freedom of speech and association. The district court, however, dismissed *sua sponte* Samford's complaint as frivolous and as failing to state a claim. Samford now appeals, and we affirm the judgment of the district court for the following reasons.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Scott Samford ("Samford") and Cynthia Samford had two sons, Andrew and Benjamin, before divorcing. After the divorce and on or about August 29, 1997, the boys—eleven and fourteen years old at the time—were at Cynthia's house when Samford arrived brandishing a handgun and threatening to shoot Cynthia, any police officers that Cynthia might call, and himself. He made good on the final threat and shot himself in the neck. After surviving the gunshot, Samford pleaded *nolo contendere* to aggravated assault on January 15, 1998. In

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

2

her victim impact statement regarding the assault, Cynthia stated, "[m]y children and myself are in constant fear for our lives due to Scott Samford's behavior and mental condition." Samford was placed on five years' probation on the condition that he have no contact with Cynthia, Andrew, or Benjamin. A few months later, Samford violated this probation condition by contacting his sons and ex-wife and, on June 11, 1998, was sentenced to twenty years' incarceration with the Texas Department of Criminal Justice ("TDCJ"). While in prison, "Cynthia Samford contacted the prison system and attempted to place Andrew and Benjamin Samford on a 'negative mail list,'" according to one of Samford's filings. Samford was then informed that Andrew and Benjamin had been placed on his negative mail list;[1] additionally, a letter was sent to Cynthia stating that Andrew and Benjamin had been placed on Samford's negative mail list. Andrew and Benjamin were also removed from Samford's list of approved visitors. Since that time, Samford has repeatedly and unsuccessfully attempted to send letters to Andrew and Benjamin. Some of these letters, according to Samford, have not been returned to him. Further, when Samford's mother attempted to send two photos of the boys to Samford, he was not permitted to receive the photos because the boys were on his negative mail list. The photos were sent back to Samford's mother. Samford does not allege that either Andrew or Benjamin has ever attempted to visit or otherwise communicate with him.

Samford challenged the limitations placed on his communication with Andrew and Benjamin in two separate courts: the District Court for the Northern District of Texas and the District Court for the Southern District of Texas. The related claims were consolidated below.

---

[1] The Offender Orientation Handbook states that "[o]ffenders shall be denied permission to correspond with persons on their negative mailing list." TDCJ, OFFENDER ORIENTATION HANDBOOK 82 (2004), *available at* http://www.tdcj.state.tx.us/publications/cid/OffendOrientHbkNov04.pdf.

Samford filed his claim in the District Court for the Northern District of Texas on May 17, 2005. He originally sued Cynthia, arguing that she violated § 1983 by conspiring with public officials to, among other things, prevent him from communicating with his sons. Samford subsequently amended his complaint to include allegations against additional defendants, including Douglas Dretke. All of Samford's claims were dismissed except his claim alleging that Dretke was impermissibly preventing Samford from communicating with Andrew and Benjamin. This remaining claim was transferred to the District Court for the Southern District of Texas, where Samford had filed a related suit.

On June 8, 2005, Samford filed suit in the District Court for the Southern District of Texas. He brought claims under § 1983 and argued that Dretke, Warden Staples, Dr. Scarmado, Lisa Vatani, Minnie Crouch, and the law librarian ("defendants") violated his constitutional rights by denying him medically based work restrictions, refusing to issue him adequate legal supplies and storage for such supplies, and preventing him from communicating with his sons. Samford sought damages and injunctive relief for these alleged violations. After considering Samford's more than forty filings, the district court dismissed all the claims *sua sponte* under 28 U.S.C. §§ 1915(e)(2)(B)(i) & (ii) on April 28, 2006.

Samford now appeals the dismissal of his § 1983 claim concerning the restrictions on communicating with his sons. He argues that the district court erred in concluding that defendants Dretke, Crouch, and Warden Staples did not violate his First Amendment rights by preventing his communication with Andrew and Benjamin through enforcing his negative mail list and by removing

4

Andrew and Benjamin from his approved visitors list.[2]  The Texas Attorney General, at our invitation, filed an amicus brief in support of defendants.

## II. STANDARD OF REVIEW

When a district court dismisses a complaint both as frivolous and as failing to state a claim under §§ 1915(e)(2)(B)(i) & (ii), we review the dismissal de novo. *See Longoria*, 507 F.3d at 901.  To determine if a complaint fails to state a claim, we apply the same standard of review applicable to dismissals made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and will uphold a dismissal if, "taking the plaintiff's allegations as true, it appears that no relief could be granted based on the plaintiff's alleged facts." *Harris v. Hegmann*, 198 F.3d 153, 156 (5th Cir. 1999) (internal quotation marks omitted).  Alternatively, a claim may be dismissed as frivolous if "it lacks any arguable basis in law or fact." *Id.*  "'A complaint lacks an arguable basis in law if it is based on an indisputably meritless legal theory, such as if the complaint alleges violation of a legal interest which clearly does not exist.'" *Id.* (quoting *Harper v. Showers*, 174 F.3d 716, 718 (5th Cir. 1999)).  A complaint lacks an arguable basis in fact when "the facts alleged are fantastic or delusional scenarios or the legal theory upon which a complaint relies is indisputably meritless." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

Samford appears before this court for a fourth time after stating meritless claims in three prior civil rights suits. *See Samford v. Staples*, 231 F. App'x 374 (5th Cir. 2007); *Samford v. Staples*, 249 F. App'x 1001 (5th Cir. 2007); *Samford*

---

[2] We note that these claims were only alleged against TDCJ, Dretke, Crouch, and Warden Staples.  Thus, our references to "defendants" specifically refer to these defendants.  Samford does not appeal any claim against the remaining defendants, and those claims are therefore waived. *See Longoria v. Dretke*, 507 F.3d 898, 901 (5th Cir. 2007) ("Although we liberally construe *pro se* briefs, such litigants must still brief contentions in order to preserve them.").

5

*v. Bowers*, No. 00-10246, 2000 WL 1741640 (5th Cir. Nov. 16, 2000). His current complaint challenges the enforcement of his negative mail list and the removal of his sons from his approved visitors list. As in his previous suits, Samford's contentions fail to state a claim.

## A. Enforcing Samford's Negative Mail List

Samford avers that defendants violated his First Amendment rights by restricting his communication with Andrew and Benjamin. His claims regarding defendants' intercepting his outgoing non-legal mail to his sons, defendants' refusing to return the intercepted letters, and defendants' preventing Samford from receiving photos of his sons all center on defendants' practices in enforcing Samford's negative mail list.[3]

"[I]n determining the constitutional validity of prison practices that impinge upon a prisoner's rights with respect to mail, the appropriate inquiry is whether the practice is reasonably related to a legitimate penological interest." *Brewer v. Wilkinson*, 3 F.3d 816, 824 (5th Cir. 1993) (applying the standard articulated in *Turner v. Safley*, 482 U.S. 78 (1987)). Although the Supreme Court has indicated that this standard applies to limitations on prisoners' incoming mail and that the standard articulated in *Procunier v. Martinez*[4] applies to limitations on prisoners' outgoing mail, *see Thornburgh v. Abbott*, 490 U.S. 401, 413–14 (1989), a panel of this court has interpreted *Thornburgh* to apply the reasonableness standard set forth in *Turner* in both instances, *see Brewer*, 3 F.3d at 824 ("Although the Court appeared to draw a distinction

---

[3] In his brief, Samford additionally complains that he has not been permitted to call Andrew and Benjamin on the telephone. Because he raises this argument for the first time on appeal, we do not consider it. *See Maringo v. McGuirk*, 268 F. App'x 309, 311 (5th Cir. 2008).

[4] 416 U.S. 396, 413 (1974) (stating that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression" and that "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved").

6

between incoming and outgoing mail . . . , its 'reading' of *Martinez* in *Thornburgh* suggests that *Turner*'s 'legitimate penological interest' test would also be applied to outgoing mail."); *see also id.* at 825–26 (applying the "legitimate penological interest" test to plaintiffs' challenges concerning defendants' practice of inspecting outgoing mail).  The panel reasoned that *Thornburgh*'s distinction between incoming and outgoing prisoner mail was based on the different penological interests involved:

> We must first emphasize that the Supreme Court in *Thornburgh* made it clear that a distinction still exists between incoming prison mail and outgoing prison mail.  But that distinction revolves around the differing penological concerns with respect to outgoing and incoming mail.  Specifically, the Court recognized that "[t]he implications of outgoing correspondence for prison security are of categorically lesser magnitude than the implications of incoming materials."

*Id.* at 825 (alteration in original) (quoting *Thornburgh*, 490 U.S. at 413); *see also Smith v. Delo*, 995 F.2d 827, 830 (8th Cir. 1993) (applying the *Turner* standard to outgoing mail and stating "*Martinez* is limited to outgoing correspondence when deciding the degree of security risk involved; however, . . . it appears that *Martinez* should not be understood as establishing a special test that applies only when evaluating the constitutionality of regulations governing outgoing mail").

Under *Turner*, we evaluate the reasonableness of a practice by considering four factors:

> (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives that could fully accommodate[] the prisoner's rights at *de minimis* cost to valid penological interests."

7

*Mayfield v. Tex. Dep't of Criminal Justice*, 529 F.3d 599, 607 (5th Cir. 2008) (quoting *Turner*, 482 U.S. at 89–91). "[W]e have noted that rationality is the controlling factor, and a court need not weigh each factor equally." *Id.* Further, our analysis must give due regard to the decisions of prison officials: "'prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations.'" *Turner*, 482 U.S. at 89 (omission and alteration in original); *see also Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 863 (5th Cir. 2004) ("[T]he Court is equally cognizant of the inherent demands of institutional correction, the deference owed to prison administrators, and the subjugation of individual liberty that lawful incarceration necessarily entails."). We now turn to the application of these four factors in light of the deference owed to prison administrators.

Considering *Turner*'s first factor, defendants' enforcement of Samford's negative mail list is rationally related to the legitimate interest of protecting crime victims and their families from unwanted communications and harassment by prisoners when a victim requests such protection. The district court stated that defendants have a legitimate interest "in upholding court orders, in rehabilitating inmates, and in protecting crime victims and their families from unwanted harassment from inmates." Samford's pleadings, according to the court, admitted the existence of an ongoing court order that prohibited Samford from contacting his children. Even without the order, however, the district court concluded that defendants' actions are constitutional because "a prison has a legitimate governmental interest in upholding a crime victim's simple wish to avoid communication directed at her or her children from her assailant."

After reviewing Samford's filings, we do not agree that Samford admits the existence of an ongoing state court order; indeed, he has repeatedly denied the existence of such an order. Nonetheless, we agree with the district court's

8

alternative reasoning. Prisons have a legitimate interest in protecting crime victims and their families from the unwanted communications of prisoners when a victim requests that the prison prevent such communication.[5] *See Berdella v. Delo*, 972 F.2d 204, 209 (8th Cir. 1992) ("[T]he government's interest in protecting the public from harassment by inmates would justify prohibiting an inmate from sending mail to persons who have affirmatively requested that mail not be received from an inmate."); *see also Jones v. Diamond*, 594 F.2d 997, 1014 (5th Cir. 1979) (validating the use of negative mail lists and stating "jail officials may employ a 'negative mail list' to eliminate any prisoner correspondence with those on the outside who affirmatively indicate that they do not wish to receive correspondence from a particular prisoner"); *Guajardo v. Estelle*, 580 F.2d 748, 753 (5th Cir. 1978) (affirming the district court's determination that a negative mail list does not violate prisoners' First Amendment rights and stating that such lists "permit [prison officials] to deny inmates permission to correspond with persons who have objected to further correspondence"). And defendants' enforcement of Samford's negative mail list bears a rational connection to this legitimate interest: Samford's pleadings acknowledge that he was placed on probation after pleading *nolo contendere* to aggravated assault when he went to Cynthia's home, where Andrew and Benjamin were located, and made various threats before shooting himself just outside the front door. Further, he acknowledges that his probation was conditioned on having no contact with Andrew and Benjamin and that he nonetheless disregarded this condition.

---

[5] Samford does not argue that the fact that both his sons have now reached the age of majority undercuts the prison's current reliance on the letter from Cynthia as a basis for continuing the sons on Samford's negative mail list, removing them from his approved visitors list, and interdicting pictures of the sons. That said, we assume that if either son were to attempt to reestablish contact with Samford, the prison would reconsider the mail, visitation, and pictures restrictions related to that son.

9

Thus, *Turner*'s first, and controlling, factor weighs in favor of the reasonableness of defendants' enforcement of Samford's negative mail list.

The second factor under *Turner* asks whether alternative means of exercising the right remain open to the prisoner. This factor further favors defendants' practice of enforcing the negative mail list. Though Samford argues that defendants' enforcement of his negative mail list leaves him with no alternative to communicate with Andrew and Benjamin, Samford's own reply brief evidences such an alternative. In it, Samford admits that his mother has visited and brought messages to him from Cynthia. Samford's mother could just as easily relay oral messages from Andrew and Benjamin if they wished to send such a message to Samford. *See Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (stating that "inmates can communicate with those who may not visit by sending messages through those who are allowed to visit" in concluding that inmates have an alternative means of associating with individuals prohibited from visiting). "Alternatives . . . need not be ideal, however; they need only be available." *Id*. Thus, Samford is not completely prevented from communicating with Andrew and Benjamin, and this factor supports the reasonableness of defendants' enforcement of the negative mail list.

The third factor considers the impact that accommodating the prisoner's right will have on the allocation of prison resources and, here, cuts neither for nor against the reasonableness of defendants' enforcing Samford's negative mail list. It is the policy of TDCJ to maintain negative mail lists, and Samford here seeks to remove two individuals from his list. Accommodating Samford in this way would have little, if any, effect on the allocation of the prison's resources.

Under the fourth factor, the existence of alternatives to a practice may undermine the reasonableness of that practice. However, "*Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the

10

asserted right while not imposing more than a *de minimis* cost to the valid penological goal." *Overton*, 539 U.S. at 136; *see also Victoria W. v. Larpenter*, 369 F.3d 475, 484 (5th Cir. 2004) (stating that under *Turner*'s fourth factor, "an inmate must present evidence of a ready alternative that fully accommodates a prisoner's rights at *de minimis* cost to valid penological interests"). Samford fails to present an alternative to defendants' enforcement of his negative mail list other than the complete removal of Andrew and Benjamin from the list. Thus, this factor does not undermine the reasonableness of defendants' practice.

Based on *Turner*'s factors, we conclude that defendants' enforcement of Samford's negative mail list is reasonable. Samford avers, however, that defendants' practice is unreasonable because the defendants have failed to return some of his blocked letters as provided in the Offender Orientation Handbook. He further contends that the same handbook states that a parent outside the prison cannot place an inmate's child on the negative mail list. These arguments are unavailing. First, a prison official's failure to follow the prison's own policies does not, itself, result in a constitutional violation. *See Richardson v. Thornton*, No. 08-30012, 2008 WL 4933742, at \*1 (5th Cir. Nov. 19, 2008) ("The failure of the prison to follow its own policies . . . is not sufficient to make out a civil rights claim."); *Sandoval v. Fox*, 135 F. App'x 691, 691–92 (5th Cir. 2005) ("The mere failure to comply with prison rules and regulations does not, without more, give rise to a constitutional violation."). Second, the prison's handbook also recognizes the interest of protecting victims by stating that minor children of an inmate may be placed on that inmate's negative mail list when they are the victim of that inmate. And finally, the reasonableness of preventing Samford from contacting Andrew and Benjamin is apparent given the circumstances surrounding how Samford came to find himself imprisoned in the first place.

11

Based on our application of the *Turner* factors, enforcing Samford's negative mail list is reasonable. Samford has therefore failed to state a claim.

## B. Removing Samford's Sons From His Visitor List

The district court did not separately address Samford's claim that defendants' removal of his sons from his approved visitors list violated his constitutional rights in reviewing the limitations on Samford's communications; however, reviewing de novo, we conclude that Samford has similarly failed to state a claim based on the removal of Andrew and Benjamin from his approved visitors list.

"This Court has repeatedly held that for convicted prisoners '[v]isitation privileges are a matter subject to the discretion of prison officials.'" *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999) (quoting *McCray v. Sullivan*, 509 F.2d 1332, 1334 (5th Cir. 1975)). Thus, even where a prisoner was prohibited from visiting with his mother on a single occasion, we stated that "[the prisoner] has no constitutional right to visitation privileges." *Id.*; *see also Charles v. Nance*, 186 F. App'x 494, 495 (5th Cir. 2006) ("[P]risoners have no absolute constitutional right of visitation."). We need not go so far as to say Samford has no right to visitation privileges, but we are satisfied that defendants' removing Andrew and Benjamin from Samford's approved visitors list does not violate Samford's constitutional rights for the same reasons that justify defendants' enforcement of Samford's negative mail list. We further note that Samford does not allege that his sons—who have both reached the age of majority according to Samford's filings—have ever attempted to visit him or that any such attempt has been prevented.[6] Therefore, Samford has failed to state a claim and his

---

[6] Samford does contend that the letter sent by defendants informing Cynthia that Andrew and Benjamin had been placed on Samford's negative mail list prevented his sons from visiting him. That letter, however, states nothing more than that Andrew and Benjamin had been placed on Samford's negative mail list. It said nothing with regard to whether Andrew and Benjamin may visit Samford.

complaint was properly dismissed. *See Berry*, 192 F.3d at 508 ("[T]he magistrate judge properly dismissed [the prisoner's] section 1983 claim based on the denial of a visit . . . as both frivolous and for failure to state a claim . . . .").

## IV. CONCLUSION

For the above reasons, we AFFIRM the judgment of the district court. Further, we note that while the current appeal was pending, this court imposed a § 1915(g) bar against Samford. *See Samford*, 249 F. App'x at 1004–05. We remind Samford that he is barred from proceeding *in forma pauperis* in any civil action or appeal filed while he is incarcerated or detained in any facility unless he is under imminent danger of serious physical injury. *See* § 1915(g). Samford is also warned that continued filing of frivolous actions or appeals may subject him to increasingly severe sanctions, including monetary penalties. *See Malone v. Waggener*, 296 F. App'x 422, 423 (5th Cir. 2008).