PD-1505-14
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/27/2015 10:03:06 AM
Accepted 3/27/2015 10:43:48 AM
ABEL ACOSTA
CLERK

Case No.  PD-1505-14

---

In the Court of Criminal Appeals of Texas

---

David Schlittler v. The State of Texas

---

On Discretionary Review
of Appeal No. 12-13-00269-CR
in the Twelfth Court of Appeals of Texas
at Tyler

---

**Appellant's Brief**

---

State Counsel for Offenders
Attorney for Appellant

Kenneth Nash
Texas Bar No. 14811030
P. O. Box 4005
Huntsville, TX  77342
Telephone no. 936-437-5291
Facsimile no. 936-437-5279
E-mail address:  Ken.Nash@tdcj.texas.gov

**Oral Argument Requested and Previously Granted**

## Identity of Judge, Parties, and Counsel

**Trial Court Judge**
Deborah Oakes Evans

**Parties**
The State of Texas

David Schlittler (Appellant)

**Trial Counsel**
Allyson Mitchell (attorney for the State)
904 E. Market St.
Palestine, TX 75801

Barbara Law (attorney for Schlittler)
P. O. Box 4005
Huntsville, TX 77342

**Appellate Counsel**
Kenneth Nash (attorney for Schlittler)
P. O. Box 4005
Huntsville, TX 77342

Melinda Fletcher (attorney for the State)
P. O. Box 1744
Amarillo, TX 79105

**Discretionary Review Counsel**
Kenneth Nash (attorney for Schlittler)
P. O. Box 4005
Huntsville, TX 77342

Melinda Fletcher (attorney for the State)
P. O. Box 1744
Amarillo, TX 79105

## Table of Contents

Identity of Judge, Parties, and Counsel……………………………………………….2

Index of Authorities……………………………………………………...4-9

Statement of the Case……………………………………………………10-11

Statement Regarding Oral Argument…………………………………………..11

Issues Presented…………………………………………………..11-12

1.  Did the Twelfth Court of Appeals err by holding that Section 38.111, Penal Code, as applied to Schlittler, does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution?

2.  Did the Twelfth Court of Appeals err by holding that Section 38.111, Penal Code, as applied to Schlittler, does not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution?

Statement of the Facts……………………………………………………12-13

Summary of the Argument…………………………………………………..13

Argument……………………………………………………………14-49

Prayer……………………………………………………………...49

Certificate of Compliance…………………………………………………50

Certificate of Service…………………………………………………...51

## Index of Authorities

**Cases**

*Bartels v. Iowa*, 262 U.S. 404 (1923)……………………………………………….17

*Beard v. Banks*, 548 U.S. 521 (2006)…………………………………...31,33,44,46

*Beck v. State*, 583 S.W.2d 338 (Tex. Crim. App. 1979)………………………..19

*Bell v. Wolfish*, 441 U.S. 520 (1979)…………………………………………….15,16

*Board of Education of Independent School District No. 92
of Pottawatomie County v. Earls*, 536 U.S. 822 (2002)…………………………..24

*Buck v. Bell*, 274 U.S. 200 (1927)…………………………………………………...28

*Burson v. Freeman*, 504 U.S. 191 (1992)…………………………………...26,29

*Caban v. Mohammed*, 441 U.S. 380 (1979)…………………………………………21

*Cannady v. State*, 11 S.W.3d 205 (Tex. Crim. App. 2000)………………………37

*Carter v. Carter Coal Co.*, 298 U.S. 238 (1936)…………………………………….20

*Casarez v. State*, 913 S.W.2d 468 (Tex. Crim. App. 1994)………………….......37

*Citizens United v. Federal Election Commission*,
558 U.S. 310 (2010)……………………………………………………...18,37

*City of Cleburne, Texas v. Cleburne Living Center*,
473 U.S. 432 (1985)……………………………………………………………40

*Clark v. Jeter*, 486 U.S. 456 (1988)………………………………………………….37

*Cleveland Board of Education v. LaFleur*,
414 U.S. 632 (1974)…………………………………………………………...27,28

*Cutter v. Wilkinson*, 544 U.S. 709 (2005)……………………………………...43

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012)………………………..19

*Doe v. Prosecutor, Marion County, Indiana*,
705 F.3d 694 (7th Cir. 2013)…………………………………………………………19

*Eisenstadt v. Baird*, 405 U.S. 438 (1972)……………………………………………16

*Engel v. Vitale*, 370 U.S. 421 (1962)………………………………………………...17

*Ex parte Lo*, 424 S.W.3d 10 (Tex. Crim. App. 2013)……………………………19

*Farrington v. Tokushige*, 273 U.S. 284 (1927)……………………………………...17

*Fisher v. University of Texas at Austin*, 570 U.S. ___,
133 S.Ct. 2411 (2013)……………………………………………………………26,41

*Flores v. State*, 904 S.W.2d 129 (Tex. Crim. App. 1995)…………………………...39

*Frontiero v. Richardson*, 411 U.S. 677 (1973)……………………………………39

*Ginsberg v. New York*, 390 U.S. 629 (1968)………………………………………...17

*Griswold v. Connecticut*, 381 U.S. 479 (1965)……………………………………...16

*Henderson v. State*, 962 S.W.2d 544 (Tex. Crim. App. 1997),
cert. denied, 525 U.S. 978 (1998)……………………………………………15,27,28

*Holt v. Hobbs*, 574 U.S. ___, 135 S.Ct. 853 (2015)………………………………43

*Illinois ex rel. McCollum v. Board of Education of School District No. 71,
Champaign County, Illinois*, 333 U.S. 203 (1948)………………………………..17

*In re J.W.T.*, 872 S.W.2d 189 (Tex. 1995)………………………………………...17

*In re Mays-Hooper*, 189 S.W.3d 777 (Tex. 2006)………………………………..14

*Ingraham v. Wright*, 430 U.S. 651 (1977)…………………………………….15,24

*Jacobson v. Massachusetts*, 197 U.S. 11 (1905)………………………………….24

5

*Johnson v. California*, 543 U.S. 499 (2005)……………………………….30,31,43,44

*Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988)…………………….41

*Kansas v. Hendricks*, 521 U.S. 346 (1997)……………………………………….29

*Korematsu v. United States*, 323 U.S. 214 (1944)………………………………...29

*Lanza v. New York*, 370 U.S. 139 (1962)………………………………………...35,48

*Lassiter v. Department of Social Services of Durham County*,
452 U.S. 18 (1981)…………………………………………………………17,18,21

*Lawrence v. Texas*, 539 U.S. 558 (2003)………………………………….......19

*Lehr v. Robertson*, 463 U.S. 248 (1983)………………………………………..21

*Lewis v. Casey*, 518 U.S. 343 (1996)…………………………………………15,35,48

*Little v. Streater*, 452 U.S. 1 (1981)………………………………………………18

*Loving v. Virginia*, 388 U.S. 1 (1967)………………………………………….16

*Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976)…………….37

*Massiah v. United States*, 377 U.S. 201 (1964)………………………………...20

*May v. Anderson*, 345 U.S. 528 (1953)………………………………………...17

*Meyer v. Nebraska*, 262 U.S. 390 (1923)………………………………………17

*Michael H. v. Gerald D.*, 491 U.S. 110 (1989)………………………………...14

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996)………………………………………..39

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977)………………………..14,28

*Morrissey v. Brewer*, 408 U.S. 471 (1972)………………………………………15

*Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471 (1977)………….25

*O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)……………………………….33,46

*Overton v. Bazetta*, 539 U.S. 126 (2003)……………………….16,23,32,33,45,46

*Pell v. Procunier*, 417 U.S. 817 (1974)……………………………………..36,49

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925)………………………………...17,18

*Plyler v. Doe*, 457 U.S. 202 (1982)……………………………………...22,37,38

*Price v. Johnston*, 334 U.S. 266 (1948)………………………………………...15

*Prince v. Massachusetts*, 321 U.S. 158 (1944)………………………………….24

*Procunier v. Martinez*, 416 U.S. 396 (1974)……………………………16,34,39,47

*Quilloin v. Walcott*, 434 U.S. 246 (1978)………………………………..17,21,39

*Reed v. Reed*, 404 U.S. 71 (1971)………………………………………………40

*Regents of the University of Michigan v. Ewing*,
474 U.S. 214 (1985)…………………………………………………………….26

*Roe v. Wade*, 410 U.S. 113 (1973)……………………………………………...17

*Romer v. Evans*, 517 U.S. 620 (1996)………………………………………….41

*Samford v. Dretke*, 562 F.3d 674 (5th Cir. 2009)……………………………….33,46

*Santosky v. Kramer*, 455 U.S. 745 (1982)……………………………….18,24,39

*School District of Abington Township, Pennsylvania v. Schempp*,
374 U.S. 203 (1963)……………………………………………………………17

*Shaw v. Murphy*, 532 U.S. 223 (2001)……………………………….31,32,44,45

*Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535 (1942)…………………..42

*Smith v. Organization of Foster Families*, 431 U.S. 816 (1977)…………………..21

*Stanley v. Illinois*, 405 U.S. 645 (1972)……………………………………………...39

*Thornburgh v. Abbott*, 490 U.S. 401 (1989)………………16,34,35,36,39,47,48,49

*Troxel v. Granville*, 530 U.S. 57 (2000)………………………………...14,16,22,24

*Turner v. Safley*,482 U.S. 78 (1987)……..………………...16,30-35,42-45,47,48

*United States v. Windsor*, 570 U.S. ___, 133 S.Ct. 2675 (2013)…………………16

*Vacco v. Quill*, 521 U.S. 793 (1997)…………………………………………..37,41

*Vernonia School District 47J v. Acton*, 515 U.S. 646 (1995)………………….…..24

*Washington ex rel. Seattle Trust Title Co. v. Roberge*,
278 U.S. 116 (1928)……………………………………………….........20

*Washington v. Glucksberg*, 521 U.S. 702 (1997)…………………………………26

*Washington v. Harper*, 494 U.S. 210 (1990)……………………………30,33,43,46

*Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164 (1972)……………………22

*West v. Atkins*, 487 U.S. 42 (1988)………………………………………………20

*West Virginia State Board of Education v. Barnette*,
319 U.S. 624 (1943)…………………………………………………17

*Wirsching v. Colorado*, 360 F.3d 1191 (10th Cir. 2004)…………………………..23

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)………………………………………17

*Wolff v. McDonnell*, 418 U.S. 539 (1974)………………………………………16

*Zablocki v. Redhail*, 434 U.S. 374 (1978)………………………………………37

**Constitutions**

Amendment XIV, Constitution of the United States…………………………14,36

**Statutes**

Section 153.009(a), Family Code………………………………………….......28

Section 155.001(a) and (c), Family Code…………………………………….25

Section 161.001, Family Code……………………………………………….25

Section 38.111, Penal Code……………………………………………….......10,19

**Rules**

Rule 78.1(c), Rules of Appellate Procedure………………………………….49

## Statement of the Case

On November 18, 2010, an Anderson County grand jury returned an indictment charging Schlittler with violating Section 38.111, Penal Code (Improper Contact with Victim),[1] alleged to have occurred on or about September 4, 2008. C.R. at 9-11.  Thereafter, on May 15, 2013, a jury found Schlittler guilty as charged in the indictment and assessed his punishment at 8 years' confinement in

---

[1]     Section 38.111, Penal Code, provides as follows:
(a) A person commits an offense if the person, while confined in a correctional facility after being charged with or convicted of an offense listed in Article 62.001(5), Code of Criminal Procedure, contacts by letter, telephone, or any other means, directly or through a third party, a victim of the offense or a member of the victim's family, if:
> (1) the victim was younger than 17 years of age at the time of the commission of the offense for which the person is confined; and
> (2) the director of the correctional facility has not, before the person makes contact with the victim:
>> (A) received written and dated consent to the contact from:
>>> (i) a parent of the victim;
>>> (ii) a legal guardian of the victim;
>>> (iii) the victim, if the victim is 17 years of age or older at the time of giving the consent; or
>>> (iv) a member of the victim's family who is 17 years of age or older; and
>> (B) provided the person with a copy of the consent.
(c) It is an affirmative defense to prosecution under this section that the contact was:
> (1) indirect contact made through an attorney representing the person in custody; and
> (2) solely for the purpose of representing the person in a criminal proceeding.
(d) An offense under this section is a Class A misdemeanor unless the actor is confined in a correctional facility after being convicted of a felony described by Subsection (a), in which event the offense is a felony of the third degree.
(e) In this section, "correctional facility" means:
> (1) any place described by Section 1.07(a)(14); or
> (2) a "secure correctional facility" or "secure detention facility" as those terms are defined by Section 51.02, Family Code.

10

the Texas Department of Criminal Justice (TDCJ). C.R. at 300 and 304; 4 R.R. at 149; 5 R.R. at 39. That same day the trial court entered a judgment adjudicating guilt and imposing sentence in accordance with the jury's verdicts. C.R. at 323-24; 5 R.R. at 39-40. On October 30, 2014, the Twelfth Court of Appeals affirmed the trial court's judgment. *Schlittler v. State*, No. 12-13-00269-CR, 2014 Tex. App. LEXIS 11904 at *8 (Tex. App.—Tyler 2014, pet. granted). (Neither party filed a motion for rehearing.) Thereafter, on February 25, 2015, this Court granted Schlittler's timely-filed petition for discretionary review.

## Statement Regarding Oral Argument

This case presents issues of first impression, namely, whether the State can constitutionally criminalize a father's efforts to contact his son in derogation of his fundamental liberty interest protected by the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Schlittler has requested (and this Court has afforded him) an opportunity to further explicate by oral argument various Supreme Court precedents as those precedents should inform this Court's resolution of the issues delineated below.

## Issues Presented

1. Did the Twelfth Court of Appeals err by holding that Section 38.111, Penal Code, as applied to Schlittler, does not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution?

11

2.  Did the Twelfth Court of Appeals err by holding that Section 38.111, Penal Code, as applied to Schlittler, does not violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution?

**Statement of the Facts**

At all times material to this case, Schlittler was confined at TDCJ's Joe F. Gurney Unit for the aggravated sexual assault of his step-daughter, B.M.  3 R.R. at 19, 84-87; 6 R.R. (State's Exhibit No. 1).  On November 11, 2007, B.M.'s mother, Laurie Mitchell, obtained a modified conservatorship order[2] restricting Schlittler's contact with his son, B.S.  3 R.R. at 87-89, 96-97; 6 R.R. (State's Exhibit No. 2).  On July 21, 2008, Schlittler dispatched a series of messages through an acquaintance (Bonita Ralston) to his son *via* Internet social websites, repeatedly expressing his love to his son and to have his son convince his half-sister (B.M.) to recant her "lie."  3 R.R. at 25-43, 97-99.  Mitchell testified that at no time did she consent to Schlittler's efforts to contact B.S. after the modified conservatorship order was entered.  3 R.R. at 100.  Moreover, she reported Schlittler's unauthorized

---

[2]      Mitchell and Schlittler divorced in 1998 when B.S. was 3 years old.  3 R.R. at 84. Schlittler was "permanently enjoined from having any contact at all with [B.S.] except during periods of possession. * * * [Schlittler was] permanently enjoined from any contact with [B.S.], direct or indirect, including without limitation, communication through Bonita Ralston, or anyone acting in concert with [Schlittler] and through any means, including, but not limited to telephonic, Instant Messaging, Email, Chatroom, Text Messaging, written communication, or in person communication except for those periods of possession granted herein."  6 R.R. (State's Exhibit 2).

contacts to the Dallas Police Department and her family-law attorney (who, in turn, alerted prison officials). 3 R.R. at 101.

Schlittler moved the trial court to declare Section 38.111, Penal Code, unconstitutional (as applied to him) for impairing a fundamental right protected by the Due Process Clause and the Equal Protection Clause. C.R. at 26-31. At a pre-trial proceeding the trial court heard and denied the motions. C.R. at 83, 308; 1 R.R. at 6-8 (Pretrial Motion). Thereafter, the trial court entered findings of fact and conclusions of law in support of its ruling. C.R. at 81-85. After the conclusion of the evidentiary phase of the trial, Schlittler re-urged his motions which the trial court again denied. 4 R.R. at 124.

## Summary of the Argument

Because section 38.111 bans all communication (whether directly or indirectly) between Schlittler and his son, the statute violates Schlittler's due process and equal protection rights. The State has not and cannot articulate a compelling interest (in derogation of Schlittler's fundamental liberty interest) to prohibit all forms of contact between Schlittler and his son; therefore, section 38.111 does not withstand strict scrutiny (and the Twelfth Court of Appeals erred when it held otherwise). Moreover, section 38.111 does not even satisfy *Turner*'s more relaxed reasonable-relation test for reviewing prison rules and regulations.

13

## Argument

### 1. Due Process Clause

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides:

> No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]

This provision guarantees more than fair process; it also includes a substantive component that provides "heightened" protection against governmental interference with certain fundamental rights and liberty interests. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion).[3] See *Moore v. City of East Cleveland*, 431 U.S. 494, 543 (1977) (White, J., dissenting) (stating that "the [Supreme] Court regularly proceeds on the assumption that the Due Process Clause has more than a procedural dimension"). According to the Supreme Court's "established framework," the following issues must be resolved: (1) Does the person have an interest protected by the Constitution? If so, (2) what is the extent of the State's interest in limiting that right? *Michael H. v. Gerald D.*, 491 U.S. 110, 147 (1989) (Brennan, J., dissenting). "It is a bedrock principle of judicial restraint that a right be lodged firmly in the text or tradition of a specific

---

[3]     See *In re Mays-Hooper*, 189 S.W.3d 777 (Tex. 2006) (following the *Troxel* plurality opinion).

constitutional provision before [the Supreme Court] will recognize it as fundamental." *Lewis v. Casey*, 518 U.S. 343, 367 (1996) (Thomas, J., concurring).

The Twelfth Court of Appeals concedes "that, ordinarily, parents have a fundamental interest in the care, custody, and management of their children." *Schlittler*, 2014 Tex. App. LEXIS 11904 at *4-5. However, in a rather facile fashion the court determined that "[t]he statute, as applied, did not deprive [Schlittler] of a fundamental interest capriciously or arbitrarily[,]" *id.* at *5, and that "[t]he State has a compelling interest in protecting victims of criminal activity, and their families, even if they are all members of the same family[,]" *id.*, citing *Henderson v. State*, 962 S.W.2d 544, 562 (Tex. Crim. App. 1997), cert. denied, 525 U.S. 978 (1998). As argued below, section 38.111 is not a proper exercise of that compelling interest to protect from B.S. from his father. Instead, section 38.111 is overbroad in the context of this case.

As a prisoner, Schlittler recognizes that he no longer enjoys many of the same rights of free citizens. *Price v. Johnston*, 334 U.S. 266, 285-86 (1948). However, as a convicted prisoner he does not forfeit all constitutional protections by reason of his conviction and confinement in prison. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). And although "his incarceration deprives him of the freedom 'to be with family and friends and to form the other enduring attachments of normal life[,]'" *Ingraham v. Wright*, 430 U.S. 651, 669 (1977), quoting *Morrissey v.*

15

*Brewer*, 408 U.S. 471, 482 (1972), he hasn't forfeited all right of intimate association, *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (holding that prisoners retain the right to marry, *id.* at 94-99). That is, "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974). That being said, just because prisoners retain certain constitutional rights does not mean that these rights are not subject to reasonable restrictions and limitations. *Bell v. Wolfish*, 441 U.S. at 555. But, "[w]hen a prison regulation or practice [or, as here, a state statute] offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974), partially overruled by *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989).

The liberty interest impaired in this case, *i.e.*, the interest of parents in the care, custody, and control of their children, is perhaps the oldest of the fundamental liberty interests recognized by the Supreme Court.[4] *Troxel v.*

---

[4] The Supreme Court has readily intervened in matters regarding marriage and birth. See, *e.g.*, *Loving v. Virginia*, 388 U.S. 1 (1967) (invalidating Virginia's miscegenation statute); *United States v. Windsor*, 570 U.S. ___, 133 S.Ct. 2675 (2013) (invalidating the Defense of Marriage Act which withheld federal recognition of otherwise lawfully-contracted same-sex marriages); *Griswold v. Connecticut*, 381 U.S. 479 (1965) (invalidating Connecticut's statute prohibiting the dispensation of contraceptives to married persons); *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (invalidating New York's statute prohibiting the dispensation of contraceptives to

16

*Granville*, 530 U.S. at 65.  This right is even far more precious than people's property rights.  *Lassiter v. Department of Social Services of Durham County*, 452 U.S. 18, 38 (1981) (Blackmun, J., dissenting), citing *May v. Anderson*, 345 U.S. 528, 533 (1953) and *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).[5]  See *In re J.W.T.*, 872 S.W.2d 189, 194-95 (Tex. 1995) (stating that the "'natural right'" existing between parents and their children is one of "'constitutional dimensions'").  See also *Ginsberg v. New York*, 390 U.S. 629, 639 (1968) ("[C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society.");  *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978) ("We

---

unmarried persons); and *Roe v. Wade*, 410 U.S. 113 (1973) (invalidating Texas' statute prohibiting abortion).

[5]     For examples of cases in which the Supreme Court has shielded parental rights from governmental intrusion, see, *e.g.*, *Meyer v. Nebraska*, 262 U.S. 390 (1923) (holding that a statute requiring English-only instruction must yield to the parents' rights to have their children educated suitable to their station in life); *Bartels v. Iowa*, 262 U.S. 404 (1923) (same); *Farrington v. Tokushige*, 273 U.S. (1927) (same); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (holding that Oregon cannot through its compulsory education laws trump a parent's decision to enroll his child in a private or parochial school as opposed to a public institution); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) (invalidating a state board of education's resolution compelling its students to salute the flag and recite the pledge over the objections of their parents as practicing Jehovah's Witnesses); *Illinois ex rel. McCollum v. Board of Education of School District No. 71, Champaign County, Illinois*, 333 U.S. 203 (1948) (invalidating an Illinois school board's policy of providing religious instruction over parental objection); *Engel v. Vitale*, 370 U.S. 421 (1962) (invalidating a New York school district's regulation requiring its students to recite daily a prescribed Regent's prayer over parental objections); *School District of Abington Township, Pennsylvania v. Schempp*, 374 U.S. 203 (1963) (invalidating a Pennsylvania statute and a Baltimore school-board rule requiring their students to publicly read, at the opening of each school day, excerpts from the Bible and to recite the Lord's Prayer contrary to the preferences of their parents as observant Unitarians or professed atheists); and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) (holding that Wisconsin's law requiring children to attend the ninth and tenth grades of school violated their parents' rights as practicing members of an Amish Christian sect).

have recognized on numerous occasions that the relationship between parent and child is constitutionally protected."); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (stating that the "freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment"); and *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925) (stating that "[t]hose who nurture [a child] and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."). "Surely there can be few losses more grievous than the abrogation of parental rights." *Lassiter v. Department of Social Services of Durham County*, 452 U.S. at 40 (Blackmun, J., dissenting).

> The importance of this interest [in the continuation of the family unit and the raising of their own children] cannot easily be overstated. Few consequences of judicial action are so grave as the severance of natural family ties. *Even the convicted committed to prison and thereby deprived of his physical liberty often retains the love and support of family members.*

*Santosky v. Kramer*, 455 U.S. at 787 (Rehnquist, J., dissenting) (*Italics* added).

Because section 38.111, as applied to Schlittler,[6] impinges upon his fundamental interest in the care, custody, and management of his child, B.S., the State must show a compelling interest to curtail his parental rights and must do so as narrowly as possible. See *Citizens United v. Federal Election Commission*, 558

---

[6] A statute is unconstitutional "as applied" when it deprives a person of a protected right although the statute is an otherwise valid enactment "in the legitimate exercise of state power[.]" *Little v. Streater*, 452 U.S. 1, 16 (1981).

U.S. 310, 340 (2010); and *Beck v. State*, 583 S.W.2d 338, 343 (Tex. Crim. App. 1979) ("Since criminal penalties are exacted in an area permeated with the most fundamental of First Amendment interests, the statutory scheme involved must be subjected to exacting and close scrutiny.").[7]  To satisfy that requirement, the Twelfth Court of Appeals maintains that section 38.111(a)(2) sufficiently narrows the scope of the statute.  *Schlittler*, 2014 Tex. App. LEXIS 11904 at *5-6 ("[T]he statute acknowledges that, in some instances, the parent or legal guardian of the victim may deem it appropriate for the person who committed the offense to contact the victim or a member of the victim's family.").  But how can a statute that totally deprives a father of any form of contact with his son be construed as narrow in any sense of the word?!

Subsection (a)(2) does not narrow the breadth of the statute.[8]  Instead, subsection (a)(2) improperly delegates legislative authority to a private person to

---

[7]     See *Ex parte Lo*, 424 S.W.3d 10 (Tex. Crim. App. 2013) (wherein this Court recently invalidated part of a Texas statute proscribing the online solicitation of a minor as unconstitutionally overbroad).  See also *Lawrence v. Texas*, 539 U.S. 558 (2003) (striking down Texas' so-called sodomy law as not furthering a legitimate state interest which can justify its intrusion into a homosexual person's private life); *Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694 (7th Cir. 2013) (striking down a state statute as not narrowly tailored to serve the state's interest because the statute prohibited sex offenders' substantially protected speech rather than specifically targeting the evil of improper communications to minors); and *Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) (striking down a city ordinance that prohibited registered sex offenders from using the city's public libraries as violative of their First Amendment right to receive information).

[8]     Section 38.111(c) establishes an affirmative defense if the contact "was (1) indirect contact made through an attorney representing the person in custody; and (2) solely for the purpose of representing the person in a criminal proceeding."  Curiously, section 38.111 would not permit an inmate's attorney to contact the victim or the victim's family member in order to

consent (or withhold consent) for contact between a convicted person and his family member. *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116 (1928) (holding that Seattle's comprehensive zoning ordinance delegating to a super-majority of private property owners of adjoining land the power to consent, or not, to issue a permit to erect a philanthropic home for children or for elderly persons violated the Due Process Clause of the Fourteenth Amendment). Delegating governmental authority to a private person can invite several forms of abuse. As here, the unconstitutional delegation binds the State to the decision or inaction of the private person, makes no provision to review the private person's decision, does not bind the private person to an official duty, and subjects the aggrieved party to the private person's caprice. *Roberge*, 278 U.S. at 122. Accord *Eubank v. City of Richmond*, 226 U.S. 137, 143-44 (1912); and *Carter v. Carter Coal Co.*, 298 U.S. 238, 310-12 (1936). But the State cannot shield itself from a constitutional violation by acting through a non-governmental entity. See *Massiah v. United States*, 377 U.S. 201 (1964) (holding that Massiah's constitutional right to counsel was violated because his confession was obtained surreptitiously by a co-defendant working in concert with federal law-enforcement agents); and *West v. Atkins*, 487 U.S. 42 (1988) (holding that a private physician acted under color of

---

represent the inmate at a civil proceeding, including a hearing on a motion to modify a conservatorship order.

state law for Eighth Amendment purposes when he contracted with North Carolina to provide medical care for its prisoners).

A state statute offends the Due Process Clause if it attempts "'to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" *Quilloin v. Walcott*, 434 U.S. at 255, quoting *Smith v. Organization of Foster Families*, 431 U.S. 816, 862-63 (1977) (Stewart, J., concurring in judgment).[9] As explained below, no court has found Schlittler to be an unfit parent of his biological son, nor has any court ever determined that it was in B.S's best interest to have absolutely no contact with his father. Rather, B.S. was born during the term of Schlittler's marriage to his ex-wife. 4 R.R. at 7. After they divorced, Schlittler enjoyed "standard" visitation with his son, and his son even lived with him "full-time" for about 3 months while his ex-wife worked in Colorado. 3 R.R. at 84-85; 4 R.R. at 8, 11-12. Cf. *Lassiter v. Department of Social Services of Durham County*, 452 U.S. at 34 (Burger, C.J., concurring) (involving "the parental rights of a mother under lengthy sentence for murder who showed little interest in her son").

---

[9]      Schlittler perceives recurring trends in the Supreme Court's decisions concerning fathers *vis à vis* their biological children:  a father's fitness to be a parent and his involvement in his child's life. Compare *Caban v. Mohammed*, 441 U.S. 380 (1979) (a case in which the father participated in the rearing of his child) to *Lehr v. Robertson*, 463 U.S. 248 (1983) (a case in which the father never established a relationship with his child).

To reiterate, Schlittler was convicted of sexually assaulting his former step-daughter (B.M.), not his biological son (B.S.). As applied to Schlittler, section 38.111 swept much too broadly. Schlittler's relationship with his biological son was not implicated in his crime upon his former step-daughter. Apart from the fact that B.S. is B.M.'s half-brother, B.S. was a mere bystander to B.M.'s accusation against Schlittler, her former step-father. But, by including "a member of the victim's family," section 38.111 is "breathtakingly broad" (to borrow from *Troxel v. Granville*, 530 U.S. at 67) as applied to Schlittler. The State has no compelling interest in casting a net so widely to ensnare hapless individuals like Schlittler's own son.[10]

The State asserted that "[p]rotecting a minor sexual assault victim from undue trauma is a compelling state interest." C.R. at 43.[11] Schlittler does not

---

[10] B.S.'s interests were also implicated by section 38.111, as applied here. See *Troxel v. Granville*, 530 U.S. at 86 (Stevens, J., dissenting) ("There is at a minimum a third individual, whose interests are implicated in every case to which a [child-custody] statute applies—the child."). See also *Plyler v. Doe*, 457 U.S. 202, 219-20 (1982) (stating that children should not be penalized for the illegal conduct of their parents); accord, *id.* at 238 (Powell, J., concurring); and *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175 (1972) (stating that illegitimate children should not bear responsibility for their parents' adulterous behavior).

[11] The Office of House Bill Analysis rendered the following critique of H.B. 2890 (later codified as Section 38.111, Penal Code):

> Prior to the 77th Legislature, there was no law to punish those who contacted without consent a victim through letter, telephone, or other means while the offender was confined in a correctional facility after being charged with or convicted of certain sexual offenses. In cases of sexual assault of children, the receipt of a letter or telephone call from the offender can be devastating to the child and the child's family. House Bill 2890 creates an offense if a person while confined in a correctional facility after being charged with or convicted of a certain sexual offense contacts the victim without consent. * * *

22

quarrel with that assertion. As a sexual abuse victim, B.M. should be protected from further physical and/or psychological exploitation. See *Overton v. Bazzetta*, 539 U.S. at 133 ("Protecting children from harm is a legitimate goal."). But it is not B.M. with whom the State alleged Schlittler made an improper contact, but his own biological son, B.S., who was not his sexual-assault victim. It is on that basis that Schlittler contends the State has infringed his right to nurture his own son, not his sexual-assault victim. The State made no attempt to even articulate a compelling interest to interfere with Schlittler's fundamental right as a parent toward his own son; therefore, the State's conduct under the auspices of section 38.111 is arbitrary and capricious. In *Wirsching v. Colorado*, 360 F.3d 1191 (10th Cir. 2004) the Tenth Circuit stated:

> [¶] In assessing Mr. Wirsching's arguments, we do not discount the importance of his relationship with his children. Even inside the prison walls, that relationship is generally deserving of some form of protection. The *complete ban* upon Mr. Wirsching's visits with his children is indeed a harsh restriction, significantly more severe than the ban on family visits upheld in *Overton*. Prison officials should be careful to ensure that restrictions upon visitation with a prisoner's children are justified by the circumstances, and they should seriously consider less draconian restrictions—such as closely monitored, noncontact visitation. * * *

*Id*. at 1201 (*Italics* added) (agreeing with the lower court that Wirsching may maintain contact with his children through means other than visitation supports the reasonableness of the Colorado Department of Corrections' policy).

23

Schlittler recognizes that his parental rights to his biological son are not absolute, *Troxel v. Granville*, 530 U.S. at 88 (Stevens, J., dissenting),[12] but the State has not, and cannot, articulate a compelling interest to completely sever that right, a right which survives his incarceration. Schlitter was convicted and sentenced for sexually molesting his former step-daughter, B.S.'s half-sister. There was never any allegation or proof that he also molested—sexually or emotionally—his son, B.S. In determining that there was "a compelling interest to protect the child and [sic] that overrides David Schlittler's right to communicate with his son[,]" C.R. at 80, the trial court never found that Schlittler was an unfit parent of his son.[13] Rather, the SAPCR court[14] appointed Schlittler as B.S.'s

---

[12] See, *e.g.*, *Prince v. Massachusetts*, 321 U.S. 158 (1944) (holding that Massachusetts may pursuant to its general police powers and child-labor laws regulate the activities of children in street preaching and selling religious materials in derogation of their parents' rights as practicing Jehovah's Witnesses); *id.* at 166-67 (stating in *dicta* that a parent cannot claim freedom from compulsory smallpox vaccination on religious grounds because the right to practice one's religion freely does not include liberty to expose the community or his child to communicable disease or the latter to ill health or death, citing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Ingraham v. Wright*, 430 U.S. 651 (1977) (upholding the Dade County school system's policy of inflicting reasonable corporal punishment, without prior parental consent, for students' disciplinary infractions); *Vernonia School District 47J v. Acton*, 515 U.S. 646 (1995) (upholding a school district's policy of requiring all grade school and high school students to submit, over parental objection, to drug testing in order to participate in the school district's athletic programs); and *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822 (2002) (upholding a school district's policy of requiring all middle and high school students to submit, over parental objection, to drug testing in order to participate in any extracurricular activity).

[13] There was testimony to suggest that Schlittler attempted to contact his son (through an intermediary) in an effort to have his son convince his half-sister to recant her allegation of sexual abuse. 3 R.R. at 29-30. The trial court, however, did not expressly find that Schlittler manipulated his son for some selfish purpose. See C.R. at 78-80. But even if Schlittler had done so, the fundamental liberty interest of a natural parent in the care, custody, and management of his child "does not evaporate" simply because he has not been a model parent. *Santosky v.*

possessory conservator with specified rights and duties. 6 R.R. (State's Exhibit 2A (not admitted for proffer before the jury, 3 R.R. at 95)). Further, the SAPCR court awarded Schlittler supervised visitation with his son every first, third and fifth Saturday of each month for a maximum amount of two hours. *Id.* Therefore, the SAPCR court did not bar Schlittler from all contact with his son. But, alas, what couldn't be accomplished through the Family Code (because none of the grounds for involuntary termination of a parent-child relationship would apply, see Section 161.001, Family Code), the Penal Code could do so—and with punitive consequences.

Despite articulating the proper level of scrutiny (*i.e.*, compelling state interest) of statutes that trench upon a fundamental interest, the Twelfth Court of Appeals validated section 38.111's impairment of Schlittler's relationship with his underage son because "[i]t seems indisputable that protecting children is a *legitimate* government interest." *Shlittler*, 2014 Tex. App. LEXIS 11904 at *5 (*Italics* added). In the realm of substantive due process, basic constitutional law instructs that the "legitimate interest" test is used to scrutinize statutes that do *not* impair a fundamental right. See, *e.g.*, *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471 (1977) (holding that, because Ohio's unemployment-

_____

*Kramer*, 455 U.S. at 753 (holding that a "clear and convincing" proof standard is constitutionally required in parental-termination proceedings).

14      A "SAPCR" court has continuing jurisdiction over a suit affecting a parent-child relationship. Section 155.001(a) and (c), Family Code.

25

compensation statute conferred no discernible fundamental interest, the statute's labor-dispute provision (disqualifying non-striking workers from unemployment benefits) bore a rational relation to a legitimate state interest); *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985) (holding that, because a medical student did not have a substantive due-process right to re-take a nationally-standardized medical examination, the University faculty reasonably exercised its professional judgment to deny him that opportunity); and *Washington v. Glucksberg*, 521 U.S. 702 (1997) (holding that, because there is no substantive due-process right of competent, terminally-ill adults to commit suicide, Washington's statute banning physician-assisted suicide was reasonably related to several legitimate state interests). Strict scrutiny demands a "searching examination." *Fisher v. University of Texas at Austin*, 570 U.S. ___, 133 S.Ct. 2411, 2419 (2013). Moreover, "[i]t is a rare case in which [the Supreme Court has] held that a law survives strict scrutiny." *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality opinion). "Strict scrutiny must not be strict in theory but feeble in fact." *Fisher*, 133 S.Ct. at 2421 (vacating the Fifth Circuit's judgment and remanding the case for a more rigorous analysis of UT's admissions policy). On that score, the Twelfth Court of Appeals accorded section 38.111 a feckless analysis only.

The Twelfth Court of Appeals relied principally upon *Henderson v. State*, 962 S.W.2d at 560-63, to overrule Schlittler's substantive due-process claim. *Schlittler*, 2014 Tex. App. LEXIS 11904 at *5-6. In *Henderson* this Court upheld Section 19.03(a)(8), Penal Code (making it a capital offense to murder a child under 6 years of age) against an equal-protection challenge because those persons who murder young children forfeit their fundamental right to life. This Court determined that section 19.03(a)(8) "is rationally related to serve the government's interests in protecting young children and expressing society's moral outrage against the murder of young children." *Henderson*, 962 S.W.2d at 562. *Henderson* is inapposite here. Schlittler did not perpetrate a crime upon his own son; therefore, the State's specific effort to bar Schlittler from all contact with his son is not rationally related to its general interest in protecting young children. In short, section 38.111 (and the Twelfth Court of Appeals' interpretation of that statute) presents an "irrebutable presumption" (which the Supreme Court criticized in *Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 648 (1974)) that Schlittler's son must, at all times and in all respects, be protected from his own father.

Additionally, this Court intimated that the State's interest in protecting children decreases with age.[15] *Henderson*, 962 S.W.2d at 562-63. Here, B.S. was 18 years of age when he testified on May 15, 2013. 4 R.R. at 40. By extrapolation, B.S. was approximately 13 years old when Schlittler attempted to contact him. B.S. was not a young child, and *Henderson* does not support a wholesale rejection of Schlittler's fundamental right to family; therefore, section 38.111 sliced too deeply into Schlittler's relationship with his own flesh and blood.[16] See *Moore v. City of Cleveland*, 431 U.S. at 498 (plurality opinion) (invalidating a city's housing ordinance as an overly intrusive regulation of the family and not rationally related to a permissible governmental objective). Hence, Schlittler's substantive due-process right towards his son "required a more individualized determination" than the Twelfth Court of Appeals afforded it. See *Cleveland Board of Education v. LaFleur*, 414 U.S. at 645.

The Supreme Court has yet to enunciate a bright-line rule for identifying a compelling governmental or state interest. The court has, however, provided a few examples through its case holdings: (1) to prevent the birth of feeble-minded children who might lead lives of crime or indigency, see *Buck v. Bell*, 274 U.S. 200

---

[15] Upon request at a bench trial, the SAPCR judge "shall interview in chambers a child 12 years of age or older and may interview in chambers a child under 12 years of age to determine the child's wishes as to conservatorship or as to the person who shall have the exclusive right to determine the child's primary residence." Section 153.009(a), Family Code.

[16] Now that B.S. is an adult, section 38.111 cannot impede Schlittler's contact with his son because Schlittler's ex-wife no longer manages B.S.'s life.

28

(1927) (upholding the compulsory sterilization of a feeble-minded woman who was the daughter of a feeble-minded woman and who had already given birth to a feeble-minded child); (2) to promote national security, see *Korematsu v. United States*, 323 U.S. 214 (1944) (upholding the exclusion of Americans of Japanese ancestry during WWII in order to prevent espionage and sabotage in certain threatened areas);[17] (3) to preserve public health and safety, see *Kansas v. Hendricks*, 521 U.S. 346 (1997) (upholding Kansas' paradigm for the involuntary commitment of sexually-violent predators); and (4) to avoid violating explicit constitutional protections, see *Burson v. Freeman*, *supra* (reconciling a person's right to engage in political free speech with another person's right to vote, and upholding Tennessee's law prohibiting the solicitation of votes or distribution of campaign materials within 100 feet of the entrance of a polling place).  In other words, an interest must be necessary or crucial, rather than merely be preferred.  Preventing a father's discourse with his teenage son hardly amounts to a compelling state interest.

The Supreme Court has established a more deferential standard for reviewing prison policies, rules or regulations trenching upon inmates' fundamental rights.  A prison policy, rule or regulation will withstand

---

[17]     Although the dissent interpreted the Supreme Court's opinion as applying the rational basis test, *Korematsu v. United States*, 323 U.S. at 234-35 (Murphy, J., dissenting), the majority upheld the military order in question here as "commensurate with the threatened danger."  *Id.* at 219-20.

constitutional scrutiny if it is "reasonably related" to "legitimate security interests" and does not constitute "an exaggerated response to [the prison's] rehabilitation and security concerns." *Turner v. Safley*, 482 U.S. 78, 91 (1987) (invalidating a Missouri regulation restricting inmate marriages, yet upholding its regulation prohibiting inmate-to-inmate correspondence). This standard has been applied only to rights that are "inconsistent with proper incarceration." *Johnson v. California*, 543 U.S. 499, 510 (2005) (retaining the traditional "strict scrutiny" test for all claims of racial discrimination arising in a prison environment and invalidating the California Department of Corrections' policy of housing inmates of the same race in two-man cells).

Schlittler notes that the standard for reviewing prison regulations set forth in *Turner* primarily concerns the maintenance of order and security within prisons. *Washington v. Harper*, 494 U.S. 210, 224 (1990) ("We made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights."). Section 38.111 doesn't concern itself with institutional security but purportedly with the protection of victims and their families from further exploitation and victimization. But, in order to be thorough, Schlittler will also analyze section 38.111 under the *Turner* test.

Under *Turner*'s deferential standard, four factors are considered. First, is there a valid, rational connection between the prison regulation and the legitimate and neutral governmental interest put forward to justify it? Second, are there alternative means of exercising the right open to prison inmates? Third, what impact will accommodation of the asserted right have on guards, other inmates, and the allocation of prison resources generally? And fourth, are there ready alternatives available to the prison for achieving the legitimate penological objectives? *Turner v. Safley*, 482 U.S. at 89-90; *Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) (upholding Montana's restrictions on prisoners' communications to other inmates because prisoners do not possess a First Amendment right to provide legal assistance that enhances the protections otherwise available under *Turner*). These *Turner* reasonableness factors "boil down to a tailoring test[.]" *Johnson v. California*, 543 U.S. at 523, fn. 3 (Stevens, J., dissenting). And the "real task in this case is not balancing these factors, but rather determining whether [the prison administration] shows more than simply a logical relation, that is, whether [it] shows a *reasonable* relation." *Beard v. Banks*, 548 U.S. 521, 533 (2006) (plurality opinion) (stating that *Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective[,]" *id.* at 535).

Examined under the first *Turner* factor, section 38.111 creates an all-or-nothing proposition. A person falling within the purview of section 38.111 is subject to the whim of the other parent or legal guardian of the inmate's child. If the other parent or legal guardian consents to the "contact," then the contact may occur; if not, then there shall be no contact. It is beyond cavil that a child sexual-assault victim deserves protection from further injury. See *Overton v. Bazetta*, 539 U.S. at 133 ("Protecting children from harm is also a legitimate goal[.]"). But what can justify depriving a father of all contact with his son who was not his sexual-assault victim? There is none. And because there is none, section 38.111 is an exaggerated response to the threat of harm to a person who just happened to be a member of the victim's family. See *Turner v. Safley*, 482 U.S. at 91. Because the connection between the regulation and the asserted goal is arbitrary or irrational, section 38.111 fails, irrespective of whether the other *Turner* factors tilt in its favor. *Shaw v. Murphy*, 532 U.S. at 229-30.

The second *Turner* factor collapses onto the first factor. Because section 38.111 empowers a parent or legal guardian with the authority to withhold consent, the statute criminalizes an inmate's attempt to contact his son who might be the family member of the inmate's sexual-assault victim. As such, there are no alternative means for Schlittler to exercise his right of association with his son. Cf. *Turner v. Safley*, 482 U.S. at 92 (upholding Missouri's inmate-to-inmate

32

correspondence prohibition because, among other things, it did not deprive prisoners of all means of expression); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (upholding New Jersey's prisoner work-requirement regulation although it conflicted with Muslim inmates' attendance at weekly congregational services because Muslim inmates were not deprived of all forms of religious exercise); *Washington v. Harper*, *supra* (upholding Washington's policy of compulsory treatment of dangerous, seriously mentally-ill prisoners if the treatment is in their medical interest and if there are administrative procedures in place for them to challenge the treatment decision); *Overton v. Bazetta*, *supra* (upholding Michigan's restriction on inmate visitation with minors under the age of 18 because the restriction did not extend to an inmate's children, grandchildren, or siblings); *Beard v. Banks*, *supra* (upholding Pennsylvania's prison policy of denying certain items—*e.g.*, newspapers, magazines, and family photographs—to a group of specially dangerous and recalcitrant inmates so that the items could restored to them later as a reward for improving their behavior); and *Samford v. Dretke*, 562 F.3d 674 (5th Cir. 2009) (upholding Texas' enforcement of its "negative mail" policy as not violative of Samford's First Amendment right of association with his sons because he had other means of communicating with them).

Under the third *Turner* factor, any accommodation of Schlittler's right to contact his son will have only a *de minimis* impact on guards, other inmates, and the allocation of prison resources generally. *Turner v. Safley*, 482 U.S. at 98. TDCJ currently manages elaborate inmate visitation, telephone, mail and e-messaging (jpay.com) systems (see *General Information Guide for Families of Offenders* located at

http://tdcj.state.tx.us/documents/General_Information_Guide_for_Families_of_Offenders.pdf) within its extensive 125-unit operation. With a few key strokes on a TDCJ computer keyboard, B.S. could have been quickly added to Schlittler's approved contact list.

And under the fourth *Turner* factor, the State had other ready alternatives available for achieving its legitimate penological objectives rather than banning Schlittler from all contact with his son. The State could have limited Schlittler's contact with his son to written correspondence and/or telephonic communication and perhaps censored his letters or telephone calls for improper communication of matters touching upon his original conviction for Aggravated Sexual Assault without impermissibly burdening his constitutional right of free speech as an incarcerated person. See *Procunier v. Martinez*, *supra* (holding that censorship of prisoner mail is justified under certain circumstances); and *Thornburgh v. Abbott*, *supra* (holding that prison regulations affecting the sending of publications to

34

prisoners will be upheld if reasonably related to legitimate penological interests). Additionally, the State could have monitored any personal visits from his son in order to interdict the discussion of any sensitive matters described above. See *Lanza v. New York*, 370 U.S. 139 (1962) (holding that a jail visitation room was not constitutionally immune area from electronic surveillance).

Although the State may "regulate the time and circumstances" under which Schlittler contacts his son, *Turner v. Safley*, 482 U.S. at 99, the State has no legitimate penological interest to bar Schlittler from all contact with his son whom he did not sexually violate and who was not involved in the underlying aggravated sexual assault prosecution. Indeed, because the purported interest here (*i.e.*, protecting sexual-assault victims from further victimization) is unrelated to the suppression of Schlittler's parental right to nurture is own son, section 38.111 cannot survive even *Turner*'s less exacting reasonable-relationship test, a standard which the Supreme Court has asserted "is not toothless." *Thornburgh v. Abbott*, 490 U.S. at 414 (upholding the U. S. Bureau of Prisons' regulations restricting the content of publications its prisoners may receive as reasonably related to legitimate penological interests).

Under the *Turner* deferential reasonableness standard, "the exercise of [fundamental] freedoms may of course be regulated and constrained by their custodians, [but] they may not be obliterated either actively or passively." *Lewis v.*

*Casey*, 518 U.S. 343, 405 (1996) (Stevens, J., dissenting) (holding that a district court failed to apply the *Turner* deferential standard with respect to certain inadequacies with the Arizona Department of Corrections' prison law libraries). Thus, a prison regulation may not bar all inmate contact with a family member or outside entity. *Thornburgh v. Abbott*, 490 U.S. at 425-26 (Stevens, J., dissenting). See *Pell v. Procunier*, 417 U.S. 817, 826 (1974) ("So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that drawing such lines [to limit face-to-face visitation], prison officials must be accorded latitude."). Section 38.111 bans all contact by an inmate to a victim of the offense or a member of the victim's family whether "by letter, telephone, or any other means, either directly or through a third party[;]" therefore, even under *Turner*'s more relaxed reasonableness standard, section 38.111 is unconstitutional as applied to Schlittler.

## 2. Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides:

> No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.

A state statute implicating that provision is reviewed with "strict scrutiny" if it classifies persons in such a manner that it interferes with a fundamental right.[18] See *Cannady v. State*, 11 S.W.3d 205, 215 (Tex. Crim. App. 2000); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (stating that "classifications affecting fundamental rights are given the most exacting scrutiny"); and *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312 (1976) (stating that a statute "requires strict scrutiny" if it "impermissibly interferes with the exercise of a fundamental right" [footnotes omitted]). To survive a strict scrutiny review, the discriminatory classification must promote a compelling governmental interest and be narrowly tailored to achieve that interest. *Casarez v. State*, 913 S.W.2d 468, 473 (Tex. Crim. App. 1994). And "[w]hen a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (striking down a Wisconsin statute barring persons with child-support arrearages from marrying). The State must bear the burden to prove that the infringement furthers a compelling state interest and is narrowly tailored to achieve that interest. See *Citizens United v. Federal Election Commission*, 558 U.S. 310, 340 (2010); and

---

[18] Although the Equal Protection Clause creates no substantive rights, *Vacco v. Quill*, 521 U.S. 793, 799 (1997), it provides just as much protection as the Due Process Clause, *Plyler v. Doe*, 457 U.S. 202, 213 (1982).

*Plyler v. Doe*, 457 U.S. 202, 216-7 (1982) (treating "as presumptively invidious those classifications . . . that impinge upon the exercise of a 'fundamental right'").[19]

The class created by Section 38.111, Penal Code, comprises persons confined in a correctional facility after being charged with or convicted of certain sexual or sexually-motivated offenses. By its terms, section 38.111 does not apply to violent offenses which are not sexual or sexually motivated. Hence, non-sexual murderers, kidnappers, and robbers are excluded from the class created by section 38.111. Without analysis, the Twelfth Court of Appeals disagrees, stating tersely:

> The class created is defined by the particular crime committed, not the broader factor of being a convict who currently resides in a correctional facility. [citation omitted] The crimes carved out by Section 38.111 all involve physical and emotional harm of a particularly sensitive nature. The need to protect victims of these particular crimes, as well as their families, justifies the classification. [citations omitted]

*Schlittler*, 2014 Tex. App. LEXIS 11904 at *7.

Although perhaps not a member of a "suspect" class *per se*,[20] Schlittler does enjoy a fundamental right of society with his biological son.

---

[19]    The Supreme Court "has recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances [the Court has] sought the assurance that the classification reflects a reasoned judgment consistent with the ideal of equal protection by inquiring whether it may fairly be viewed as furthering a substantial interest of the State." *Plyler v. Doe*, 457 U.S. at 217-18 (footnote 16 omitted).

> Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as "of basic importance in our society," [citation omitted] rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect.

*M.L.B. v. S.L.J.*, 519 U.S. 102, 487 (1996) (holding that Mississippi may not condition an appeal from a trial-court decree terminating parental rights on the affected parent's ability to pay record preparation fees).  For equal-protection purposes, a father's interest in the companionship, care, custody, and management of his child is "cognizable and substantial."  *Quilloin v. Walcott*, 434 U.S. 246, 248 (1978), citing *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972) ("The private interest here, that of a man in the children he has sired and raised, undeniably warrants deference and, absent a powerful countervailing interest, protection.").  Therefore, the interests of Schlittler and his biological son is a liberty interest to be protected "from arbitrary governmental invasion."  *Procunier v. Martinez*, 416 U.S. 396, 418 (1974), partially overruled by *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989).  Accord *Santosky v. Kramer*, 455 U.S. at 774 (Rehnquist, J., dissenting) ("I do not disagree with the majority's conclusion that the interest of parents in their relationship with their children is sufficiently fundamental to come

---

[20]     To be considered "suspect," the classification must be based on "'immutable characteristics'" such as race, gender, and natural origin.  *Flores v. State*, 904 S.W.2d 129, 130 (Tex. Crim. App. 1995), citing *Frontiero v. Richardson*, 411 U.S. 677 (1973).

within the finite class of liberty interests protected by the Fourteenth

Amendment.").

The Twelfth Court of Appeals maintains that section 38.111 "provides equal

treatment for all class members' fundamental rights of parenting." *Schlittler*, 2014

Tex. App. LEXIS 11904 at *7. Specifically,

> [t]o apply the statute to some members of the class but not to those
> class members whose parental rights might be affected, like
> [Schlittler], would result in a failure to protect their victims from
> further victimization, thereby reducing the effectiveness of the statute.
> Moreover, such an application could lead to subjective and arbitrary
> determinations of which convicted sex offenders are exempt and
> would create an equal protection violation.

*Id.* Ergo, the court concludes that the statute, as applied to Schlittler, does not

violate the Equal Protection Clause because the statute has equal application to the

class members. *Id.* Clearly the court applied a more relaxed standard for

reviewing the constitutionality of a statute that classifies persons when a

fundamental liberty interest is not involved. See, *e.g.*, *Reed v. Reed*, 404 U.S. 71

(1971) (invalidating as illegitimate and irrational an Idaho statute preferring a male

over a similarly-situated female for appointment as administrator of the estate of a

person who died intestate); *City of Cleburne, Texas v. Cleburne Living Center*, 473

U.S. 432 (1985) (employing a "lesser standard of scrutiny" to review a municipal

zoning ordinance denying a special use permit for the operation of a group home

for mentally-retarded persons because mental retardation is not a suspect

classification); *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450 (1988) (upholding a North Dakota statute allowing some school boards, but not others, to assess a fee for transporting students between their homes and the public schools as not discriminating against a suspect class or interfering with a fundamental right); *Romer v. Evans*, 517 U.S. 620 (1996) (holding that a Colorado constitutional amendment that neither burdened a fundamental right nor targeted a suspect class, *i.e.*, sexually-oriented minorities, for disfavored treatment nevertheless violated the Equal Protection Clause because the amendment bore no rational relation to some legitimate end); and *Vacco v. Quill*, 521 U.S. 793 (1997) (holding that New York's statute prohibiting assisted suicide neither infringed upon fundamental rights nor involved suspect classifications and that the distinction between assisting suicide and withdrawing life-sustaining treatment had a rational basis).

Additionally, from its finding that "[t]he need to protect victims of these particular crimes, as well as their families, justifies the classification[,]" *Schlittler*, 2014 Tex. App. LEXIS 11904 at 7, the Twelfth Court of Appeals subjected section 38.111 to a less exacting standard of constitutional review than strict scrutiny requires. Strict scrutiny demands a "searching examination." *Fisher v. University of Texas at Austin*, 570 U.S. ___, 133 S.Ct. 2411, 2419 (2013). "Strict scrutiny must not be strict in theory but feeble in fact." *Id.* at 2421 (vacating the Fifth

41

Circuit's judgment and remanding the case for a more rigorous analysis of UT's admissions policy).

Although a state is not constrained in the exercise of its police power to mark a class of offenders (or a family of offenses) for "special treatment," the statute creating the classification is, however, subjected to a "strict scrutiny" review if the statute abridges a fundamental right. *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 540-41 (1942) (holding that Oklahoma's forced sterilization law of only habitual criminals ran afoul of the Equal Protection Clause because the statute deprived them of their fundamental right of procreation). The Twelfth Court of Appeals made no attempt whatsoever to distinguish *Skinner* and blithely ignores that section 38.111 singles out for prosecution only sex offenders, but not other run-of-the-mill violent criminals. In doing so, the statute impinges upon Schlittler's fundamental right to family in violation of the Equal Protection Clause.

The Supreme Court has established a more deferential standard for reviewing prison policies, rules or regulations trenching upon inmates' fundamental rights. A prison policy, rule or regulation will withstand constitutional scrutiny if it is "reasonably related" to "legitimate security interests" and does not constitute "an exaggerated response to [the prison's] rehabilitation and security concerns." *Turner v. Safley*, 482 U.S. 78, 91 (1987) (invalidating a

42

Missouri regulation restricting inmate marriages, yet upholding its regulation prohibiting inmate-to-inmate correspondence). This standard has been applied only to rights that are "inconsistent with proper incarceration." *Johnson v. California*, 543 U.S. 499, 510 (2005) (retaining the traditional "strict scrutiny" test for all claims of racial discrimination arising in a prison environment and invalidating the California Department of Corrections' policy of housing inmates of the same race in two-man cells). Cf. *Holt v. Hobbs*, 574 U.S. ___, 135 S.Ct. 853 (2015) (invalidating Arkansas' prison policy requiring inmates to shave their facial hair as violative of Holt's religious liberties).[21]

Schlittler notes that the standard for reviewing prison regulations set forth in *Turner* primarily concerns the maintenance of order and security within prisons. *Washington v. Harper*, 494 U.S. 210, 224 (1990) ("We made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights."). Section 38.111 doesn't concern itself with institutional security but purportedly with the protection of victims and their families from further exploitation and victimization. But, in order to be thorough, Schlittler will also analyze section 38.111 under the *Turner* test.

---

[21] The Supreme Court applied the standard for review prescribed by the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc *et seq.* RLUIPA codifies the "compelling governmental interest" standard. *Cutter v. Wilkinson*, 544 U.S. 709, 722-23 (2005) (upholding RLUIPA's institutionalized-persons provision as not offensive to the First Amendment's Establishment Clause).

Under *Turner*'s deferential standard, four factors are considered. First, is there a valid, rational connection between the prison regulation and the legitimate and neutral governmental interest put forward to justify it? Second, are there alternative means of exercising the right open to prison inmates? Third, what impact will accommodation of the asserted right have on guards, other inmates, and the allocation of prison resources generally? And fourth, are there ready alternatives available to the prison for achieving the legitimate penological objectives? *Turner v. Safley*, 482 U.S. at 89-90; *Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) (upholding Montana's restrictions on prisoners' communications to other inmates because prisoners do not possess a First Amendment right to provide legal assistance that enhances the protections otherwise available under *Turner*). These *Turner* reasonableness factors "boil down to a tailoring test[.]" *Johnson v. California*, 543 U.S. at 523, fn. 3 (Stevens, J., dissenting). And the "real task in this case is not balancing these factors, but rather determining whether [the prison administration] shows more than simply a logical relation, that is, whether [it] shows a *reasonable* relation." *Beard v. Banks*, 548 U.S. 521, 533 (2006) (plurality opinion) (stating that *Turner* requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective[,]" *id.* at 535).

Examined under the first *Turner* factor, section 38.111 creates an all-or-nothing proposition. An inmate within the class of offenders established by section 38.111 is subject to the whim of the other parent or legal guardian of the inmate's child. If the other parent or legal guardian consents to the "contact," then the contact may occur; if not, then there shall be no contact. It is beyond cavil that a child sexual-assault victim deserves protection from further injury. See *Overton v. Bazetta*, 539 U.S. 126, 133 (2003) ("Protecting children from harm is also a legitimate goal[.]"). But what can justify depriving a father of all contact with his son who was not his sexual-assault victim? There is none. And because there is none, section 38.111 is an exaggerated response to the threat of harm to a person who just happened to be a member of the victim's family. See *Turner v. Safley*, 482 U.S. at 91. Because the connection between the regulation and the asserted goal is arbitrary or irrational, section 38.111 fails, irrespective of whether the other *Turner* factors tilt in its favor. *Shaw v. Murphy*, 532 U.S. at 229-30.

The second *Turner* factor collapses onto the first factor. Because section 38.111 empowers a parent or legal guardian with the authority to withhold consent, the statute criminalizes an inmate's attempt to contact his son who might be the family of member of the inmate's sexual-assault victim. As such, there are no alternative means for Schlittler to exercise his right of association with his son. Cf. *Turner v. Safley*, 482 U.S. at 92 (upholding Missouri's inmate-to-inmate

correspondence prohibition because, among other things, it did not deprive prisoners of all means of expression); *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) (upholding New Jersey's prisoner work-requirement regulation although it conflicted with Muslim inmates' attendance at weekly congregational services because Muslim inmates were not deprived of all forms of religious exercise); *Washington v. Harper*, *supra* (upholding Washington's policy of compulsory treatment of dangerous, seriously mentally-ill prisoners if the treatment is in their medical interest and if there are administrative procedures in place for them to challenge the treatment decision); *Overton v. Bazetta*, *supra* (upholding Michigan's restriction on inmate visitation with minors under the age of 18 because the restriction did not extend to an inmate's children, grandchildren, or siblings); *Beard v. Banks*, *supra* (upholding Pennsylvania's prison policy of denying certain items—*e.g.*, newspapers, magazines, and family photographs—to a group of specially dangerous and recalcitrant inmates so that the items could restored to them later as a reward for improving their behavior); and *Samford v. Dretke*, 562 F.3d 674 (5th Cir. 2009) (upholding Texas' enforcement of its "negative mail" policy as not violative of Samford's First Amendment right of association with his sons because he had other means of communicating with them).

Under the third *Turner* factor, any accommodation of Schlittler's right to contact his son will have only a *de minimis* impact on guards, other inmates, and the allocation of prison resources generally. *Turner v. Safley*, 482 U.S. at 98. TDCJ currently manages elaborate inmate visitation, telephone, mail and e-messaging (jpay.com) systems (see *General Information Guide for Families of Offenders* located at

http://tdcj.state.tx.us/documents/General_Information_Guide_for_Families_of_Offenders.pdf) within its extensive 125-unit operation. With a few key strokes on a TDCJ computer keyboard, B.S. could have been quickly added to Schlittler's approved contact list.

And under the fourth *Turner* factor, the State had other ready alternatives available for achieving its legitimate penological objectives rather than banning Schlittler from all contact with his son. The State could have limited Schlittler's contact with his son to written correspondence and/or telephonic communication and perhaps censored his letters or telephone calls for improper communication of matters touching upon his original conviction for Aggravated Sexual Assault without impermissibly burdening upon his constitutional right of free speech as an incarcerated person. See *Procunier v. Martinez*, *supra* (holding that censorship of prisoner mail is justified under certain circumstances); and *Thornburgh v. Abbott*, *supra* (holding that prison regulations affecting the sending of publications to

47

prisoners will be upheld if reasonably related to legitimate penological interests). Additionally, the State could have monitored any personal visits from his son in order to interdict the discussion of any sensitive matters described above. See *Lanza v. New York*, 370 U.S. 139 (1962) (holding that a jail visitation room was not constitutionally immune from electronic surveillance).

Although the State may "regulate the time and circumstances" under which Schlittler contacts his son, *Turner v. Safley*, 482 U.S. at 99, the State has no legitimate penological interest to bar Schlittler from all contact with his son whom he did not sexually violate and who was not involved in the underlying aggravated sexual assault prosecution. Indeed, because the purported interest here (*i.e.*, protecting sexual-assault victims from further victimization) is unrelated to the suppression of Schlittler's parental right to nurture is own son, section 38.111 cannot survive even *Turner*'s less exacting reasonable-relationship test, a standard which the Supreme Court has asserted "is not toothless." *Thornburgh v. Abbott*, 490 U.S. at 414 (upholding the U. S. Bureau of Prisons' regulations restricting the content of publications its prisoners may receive as reasonably related to legitimate penological interests).

Under the *Turner* deferential reasonableness standard, "the exercise of [fundamental] freedoms may of course be regulated and constrained by their custodians, [but] they may not be obliterated either actively or passively." *Lewis v.*

*Casey*, 518 U.S. 343, 405 (1996) (Stevens, J., dissenting) (holding that a district court failed to apply the *Turner* deferential standard with respect to certain inadequacies with the Arizona Department of Corrections' prison law libraries). Thus, a prison regulation may not bar all inmate contact with a family member or outside entity. *Thornburgh v. Abbott*, 490 U.S. at 425-26 (Stevens, J., dissenting). See *Pell v. Procunier,* 417 U.S. 817, 826 (1974) ("So long as reasonable and effective means of communication remain open and no discrimination in terms of content is involved, we believe that drawing such lines [to limit face-to-face visitation], prison officials must be accorded latitude."). Section 38.111 bans all contact by an inmate to a victim of the offense or a member of the victim's family whether "by letter, telephone, or any other means, either directly or through a third party[;]" therefore, even under *Turner*'s more relaxed reasonableness standard, section 38.111 is unconstitutional as applied to Schlittler.[22]

### Prayer

Schlittler prays that this Court declare Section 38.111, Penal Code, unconstitutional as applied to him, and in accordance with Rule 78.1(c), Rules of Appellate Procedure, that this Court reverse the Twelfth Court of Appeal's judgment (and the trial court's judgment) and dismiss the indictment filed in this case.

---

[22] Although Schlittler brought the *Turner* standard to the Twelfth Court of Appeals' attention, see Appellant's Brief at 16-19, the court did not even mention *Turner* in its opinion.

49

Respectfully submitted,

State Counsel for Offenders
Attorney for Appellant

/s/ Kenneth Nash
Texas Bar No. 14811030
P. O. Box 4005
Huntsville, TX  77342
Telephone no. 936-437-5291
Facsimile no. 936-437-5279
E-mail address:  Ken.Nash@tdcj.texas.gov

## Certificate of Compliance

In accordance with Rule 9.4, Rules of Appellate Procedure, I certify that this computer-generated document complies with the typeface requirements of Rule 9.4(e) and is comprised of 9,680 words (excluding the items exempted in Rule 9.4(i)(1)).

/s/ Kenneth Nash

## Certificate of Service

I certify that a true and correct copy of the foregoing *Appellant's Brief* was served upon the State's attorney and upon the State Prosecuting Attorney noted below by one or more of the following: certified mail (return receipt requested), facsimile transfer, or electronic mail (e-mail), on March 27, 2015.

Melinda Fletcher
Special Prosecution Unit
P. O. Box 1744
Amarillo, TX 79105
Facsimile no. 866-923-9253
E-mail address: mfletcher@sputexas.org

Lisa C. McMinn
State Prosecuting Attorney
P. O. Box 13046
Austin, TX 78711
Facsimile no. 512-463-5724
E-mail address: information@spa.texas.gov

/s/ Kenneth Nash